**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0938n.06

No. 12-1510

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Oct 31, 2013

DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| CATHERINE WILKERSON, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | |
| | ) | |
| | ) | **ON APPEAL** FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| KEVIN WARNER, JANET CONNERS, | ) | DISTRICT OF MICHIGAN |
| MICHAEL MATTHEWS, MARK WEST, DEAN | ) | |
| LLOYD, ROBERT DOMEIER, and HURON | ) | **O P I N I O N** |
| VALLEY AMBULANCE INCORPORATED, | ) | |
| | ) | |
| **Defendants-Appellees.** | ) | |
| | ) | |

Before:  WHITE and DONALD, Circuit Judges, and VARLAN, Chief District Judge.[*]

**THOMAS A. VARLAN, Chief District Judge.**  This case arises out of an incident involving the protest of a political speaker at the University of Michigan on November 30, 2006. Catherine Wilkerson ("Wilkerson"), a medical doctor, attended the speech to protest with others. When she witnessed what she thought was an unconscious protestor being handled by police officers, Wilkerson involved herself in the situation by taking the protestor's vital signs before paramedics from a private emergency services corporation arrived to treat him.  When the paramedics arrived, Wilkerson disapproved of their treatment of the protestor, and she loudly voiced her opinions.  Eventually, one of the paramedics requested that the police remove Wilkerson from

---

[*]The Honorable Thomas A. Varlan, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

the area, and an officer put Wilkerson's hands behind her back and moved her to the hallway outside of the room where the speech was given. Wilkerson was subsequently charged with attempting to resist and obstruct the paramedics at the scene. She proceeded to trial and was acquitted. Wilkerson filed suit against several law enforcement officers from the scene, including the one who detained her, as well as the detective who investigated the case and sought charges against her, a paramedic, and the responding emergency services corporation. All defendants moved for summary judgment, and the district court granted summary judgment as to each. For the reasons explained herein, we **REVERSE** the grant of summary judgment to Officer Kevin Warner on Wilkerson's Fourth Amendment excessive force claim and state-law assault and battery claims, and remand this case for further proceedings with respect to those claims. We **AFFIRM** the grant of summary judgment to defendants on all other claims.

## I. BACKGROUND

Dr. Raymond Tanter, a professor at Georgetown University, was a sponsored speaker at the Michigan League on the University of Michigan campus on November 30, 2006. Wilkerson, along with various other individuals, attended the lecture to protest Dr. Tanter's speech (the "Tanter Speech"). After several individuals started heckling the speaker, University of Michigan Department of Public Safety ("UMDPS") officers removed some of the protestors from the audience. Because of his interference with the removal of another protestor, defendants UMDPS Officers Mark West ("Officer West") and Janet Conners ("Officer Conners") subdued Blaine Coleman ("Coleman") to the ground in the hallway outside of the room where the Tanter Speech was taking place. Coleman was handcuffed with his hands behind his back.

2

Wilkerson, who is a medical doctor, left the Tanter Speech and went to the hallway, where she saw Coleman with Officer West, Officer Conners, and other UMDPS officers. Coleman appeared to Wilkerson to be unconscious and, believing that he was hurt, Wilkerson informed Officer West and Officer Conners that she was a doctor. The officers allowed Wilkerson to take Coleman's vital signs. Wilkerson requested that the officers remove Coleman's handcuffs, but they refused to do so. Wilkerson maintains that she continued to attempt to give medical advice and to ask that the handcuffs be removed.

As individuals from the Tanter Speech gathered in the area around Coleman, defendant Officer Kevin Warner ("Officer Warner") of the Ann Arbor Police Department ("AAPD") arrived. Several police officers and others established a line to keep the crowd back from Coleman. Prior to Wilkerson's arrival in the hallway, UMDPS officers had requested dispatch to send for an emergency medical unit from defendant Huron Valley Ambulance, Inc. ("HVA"), and a unit arrived minutes after Wilkerson first observed Coleman. Officer West removed Coleman's handcuffs, and the HVA paramedics began working on Coleman. Defendant Dean Lloyd ("Lloyd") was an HVA supervisor at the scene, and when HVA paramedic Anthony Jacobs arrived, he became the attending paramedic. Throughout the paramedics' treatment of Coleman, Wilkerson continued to communicate her unsolicited opinions about Coleman's medical treatment and HVA's actions.

The HVA paramedics believed that Coleman was feigning unconsciousness, and Lloyd broke ammonia capsules under Coleman's nose. Wilkerson testified at her deposition that Lloyd cupped his hands over Coleman's nose and mouth and said, "You don't like that, do you?" (R. 44-10). Wilkerson demanded that Lloyd stop using the ammonia capsules, telling him that what he was

3

doing was "punitive" and "not efficacious." (R. 44-10). At some point during the treatment of Coleman, Lloyd yelled, "Get her out of here," and Officer Warner forcibly removed Wilkerson from the hallway and into a nearby stairwell. (*Id.*; R. 17). Wilkerson testified at her deposition that she was leaving the scene at that point, but that Officer Warner grabbed her wrists from behind, yanked them up toward her shoulder blades, twisted her arm, and pushed her against a wall. She further testified that his actions caused her agonizing pain and she begged him to let go of her arm. While Warner detained Wilkerson in the stairwell, HVA transported Coleman to the hospital.

AAPD officers detained Wilkerson in the stairwell for approximately twenty to thirty minutes until Officer Conners approached Officer Warner and Wilkerson and asked Wilkerson if she would like to make a statement. Wilkerson indicated that she did not, and Officer Conners gave Wilkerson her business card and told her to call if she wished to make a statement. Officer Conners informed Wilkerson that she could leave. Wilkerson was never handcuffed or formally placed under arrest while at the Michigan League. Coleman, as well as other protestors, were arrested on November 30, 2006, and they were subsequently charged with attempting to assault, resist, or obstruct a police officer.

On the evening of November 30, 2006, UMDPS Officers West and Conners each prepared and filed reports on the events at the Michigan League. Officer Conners filed additional reports on December 1, 2006, and December 18, 2006, respectively, to clarify the events. AAPD Officer Warner also wrote a detailed report on the night of November 30, 2006.

Beginning on the night of November 30, 2006, and continuing into January 2007, Wilkerson publicly criticized the University of Michigan, the UMDPS and AAPD officers, and the HVA

4

personnel, based upon their actions and treatment of her and others on the night of the Tanter Speech. On or about January 16, 2007, Wilkerson filed a citizen's complaint against Officer Warner.

Defendant UMDPS Detective Michael Mathews ("Detective Mathews") was assigned to investigate the events of November 30, 2006, and his investigation included compiling and reviewing the reports filed by Officers West, Conners, and Warner, as well as those of other officers. On January 2, 2007, Detective Mathews filed a request for a warrant with the Washtenaw County Prosecutor's Office, seeking charges against Wilkerson, specifically for resisting or obstruction of Officer Warner and the HVA personnel. Detective Mathews submitted the reports and other relevant documents to the Washtenaw County prosecutor, and on January 23, 2007, the prosecutor issued a misdemeanor complaint against Wilkerson, charging her with one misdemeanor count of attempting to assault, resist, or obstruct Officer Warner, and one misdemeanor count of attempting to assault, resist, or obstruct the HVA personnel assisting Coleman.

At some point following the Tanter Speech on November 30, 2006, but prior to May 10, 2007, HVA made the determination to remove ammonia inhalants from its vehicles. Defendant Dr. Robert Domeier ("Dr. Domeier"), the Medical Director of the Washtenaw/Livingston Medical Control Authority, informed Detective Mathews of the decision, and on May 10, 2007, Detective Mathews sent an email communicating this information to the Washtenaw County prosecutor handling the case, Margaret Connors. While Wilkerson maintains that she did not become aware of the decision to remove ammonia capsules from emergency vehicles until her criminal trial in November 2007, Wilkerson filed a brief in support of a motion to dismiss the criminal complaint

5

against her in July 2007, in which she referenced the removal of ammonia inhalants from HVA vehicles.  On December 3, 2007, a jury found Wilkerson not guilty on both misdemeanor counts.

On November 11, 2009, Wilkerson filed suit against defendants Officers Warner, Conners, and West, Detective Mathews, Dr. Domeier, Lloyd, and HVA.  Wilkerson's First Amended Complaint asserts claims for First Amendment retaliation, Fourth Amendment unreasonable seizure and prosecution without probable cause, and civil conspiracy, as well Michigan state-law claims for assault and battery, false imprisonment, and malicious prosecution.

All defendants moved for summary judgment, with three motions filed by the following groups of defendants, respectively: Officer Conners, Detective Mathews, and Officer West; Lloyd, Dr. Domeier, and HVA; and Officer Warner.  For the reasons discussed herein, the district court issued an opinion and order granting summary judgment in favor of all defendants as to all claims. *Wilkerson v. Warner*, No. 09-14558, 2012 WL 1068107, at *6 (E.D. Mich. Mar. 29, 2012).

Wilkerson filed the instant appeal, asserting the district court erred: (1) in finding that Lloyd was not a state actor clothed with the authority of state law and working in concert with police officers; (2) in finding that Wilkerson's criticism of Lloyd's conduct was not protected by the First Amendment and that there was thus no genuine issue of material fact as to whether Lloyd and Officer Warner retaliated against Wilkerson for the exercise of her First Amendment rights; (3) in granting summary judgment to the other defendants on Wilkerson's First Amendment retaliation claims based upon its finding that only Wilkerson's "post-incident" criticisms were constitutionally protected; (4) in dismissing her Fourth Amendment claims against Officers Warner, West, and Conners, Detective Mathews, and Dr. Domeier; and (5) in dismissing her state-law assault, battery,

false imprisonment, and malicious prosecution claims because it found that Officer Warner did not unreasonably seize Wilkerson and that Officers Warner and West did not knowingly swear false facts in their reports. Additionally, Wilkerson maintains that the district court inappropriately accepted defendants' version of the facts as true, made inferences in favor of defendants, and impermissibly weighed the evidence.

## II.  STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo. *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 412 (6th Cir. 2006) (citation omitted). A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (citation and internal quotation marks omitted). In reviewing a summary judgment motion, we view the evidence and reasonable inferences therefrom "in the light most favorable to" the non-moving party. *Id.* (citation omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

We also review a district court's finding of qualified immunity de novo. *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998).

7

### III.  DISCUSSION

**A.      Whether Lloyd Was a State Actor**

"To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived the plaintiff of a right secured by the Constitution or laws of the United States." *Waters v. City of Morristown*, 242 F.3d 353, 358–59 (6th Cir. 2001) (citation omitted).  Accordingly, a determination as to whether the defendant acted under the color of state law is a threshold matter. *Id.* at 359.  In *Lugar v. Edmondson Oil Co.*, the Supreme Court held that "the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible."  457 U.S. 922, 937 (1982).  Moreover, "the party charged with a deprivation must be a person who may fairly be said to be a state actor." *Id.*  In other words, "a private entity can be held to constitutional standards when its actions so approximate state action that they may be fairly attributed to the state." *Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000).

The district court found that neither Lloyd nor HVA[1] were state actors for purposes of § 1983 liability.  Wilkerson claims this conclusion was error and that the district court erroneously disregarded the effect of the Michigan resisting and obstructing statute, which she alleges clothes paramedics in state-law authority.

---

[1]HVA is alleged only to have derivative liability as a state actor through its status as Lloyd's employer, allowing § 1983 liability to attach to the private entity solely on the basis of respondeat superior.  The district court rejected this theory, and Wilkerson does not raise this issue on appeal. *See Wilkerson*, 2012 WL 1068107, at *6.

1.      *Acting in Concert*

The district court held that Wilkerson did not present evidence to support a "close enough nexus" for liability under § 1983 against Lloyd, who was employed by HVA, a private corporation. *Wilkerson*, 2012 WL 1068107, at *6. In so holding, the district court found that Wilkerson made only conclusory allegations and arguments that Lloyd and Officer Warner acted in concert in response to Wilkerson's criticism of Lloyd. *Id.* The district court also noted that it had no authority before it to suggest that police officers must comply with orders from emergency medical personnel, nor was there evidence to suggest that Lloyd had any relationship with the police departments involved that would suggest that they were acting jointly to deprive Wilkerson of her civil rights. *Id.*

Wilkerson relies primarily on *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970), as support for her contention that Lloyd was acting in concert with Officer Warner during the incidents surrounding the Tanter Speech. In *Adickes*, the Supreme Court reversed the grant of summary judgment where the plaintiff alleged § 1983 liability for a violation of her equal protection rights under the Fourteenth Amendment when she was refused service because of her race and later arrested on a vagrancy charge. 398 U.S. at 146–47. "To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents." *Id.* at 150 (citation omitted); *see also Dennis v. Sparks*, 449 U.S. 24, 28–29 (1980) (holding that a private party may be liable for conspiring with state actors to violate a plaintiff's civil rights); *Cooper v. Parrish*, 203 F.3d 937, 952 n.2 (6th Cir. 2000) ("If a private party has conspired with state officials to violate constitutional rights, then that party qualifies as

9

a state actor and may be held liable pursuant to § 1983—even though the party would not be eligible to assert a qualified immunity defense."). In *Adickes*, the Supreme Court held that the "[r]espondent . . . did not carry its burden because of its failure to foreclose the possibility that there was a policeman in the Kress store while petitioner was awaiting service, and that this policeman reached an understanding with some Kress employee that petitioner not be served." 398 U.S. at 157. In other words, there was a possibility that the private store employee reached an agreement with a state actor policeman to violate the petitioner's right to equal protection under the Fourteenth Amendment. *Id.* Wilkerson asserts that Lloyd admitted that he told Warner to remove Wilkerson in response to her criticisms and that Warner understood Lloyd's statement to be an order. Accordingly, Wilkerson argues, the evidence of record shows that Lloyd and Officer Warner acted in concert, reaching an understanding that Wilkerson would be seized and removed because she was exercising her First Amendment right to criticize Lloyd's actions.

In response, Lloyd notes that there is no evidence in the record that Wilkerson was removed because of her alleged protected speech, and he instead argues that the record shows Officer Warner removed Wilkerson from the hall to stop her from interfering with the paramedics' treatment of Coleman. Lloyd further claims that Wilkerson's reliance on *Adickes* is misplaced because, in comparison to the factual scenario here, the concerted action in *Adickes* was more deliberate and planned. Lloyd claims that in requesting that Officer Warner remove Wilkerson from the scene, he "was simply exercising his statutory right to perform his duties as an emergency medical care provider without" interference from bystanders and asserts that the record contains no evidence that he and Officer Warner were acting in a conspiracy to keep Wilkerson from exercising protected

10

speech. He additionally argues that he did not have the authority to "order" Officer Warner to remove Wilkerson from the scene and that Officer Warner made an independent decision to forcibly remove Wilkerson from the scene. Lloyd cites Tenth Circuit case law supporting his position that "'the mere furnishing of information to police officers who take action thereon does not constitute joint action under color of state law which renders a private actor liable under § 1983.'" *Lee v. Town of Estes Park*, 820 F.2d 1112, 1115 (10th Cir. 1987); *see also Gallagher v. "Neil Young Freedom Concert*," 49 F.3d 1442, 1454 (10th Cir. 1995).

A private entity or individual acting alone cannot deprive an individual of her First Amendment rights. *Lansing*, 202 F.3d at 828.[2] However, "[p]rivate persons jointly engaged with state officials in a deprivation of civil rights are acting under color of law for purposes of § 1983."

---

[2]In analyzing factual scenarios to determine whether individuals qualify as state actors such that they may be subject to liability under § 1983, we generally use three tests: the public-function test, the state-compulsion test, and the nexus test. *Lansing*, 202 F.3d at 828–30. "The public function test requires that 'the private entity exercise powers which are traditionally exclusively reserved to the state, such as holding elections or eminent domain.'" *Id.* at 828 (quoting *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992)). "The state compulsion test requires that a state exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." *Id.* at 829 (internal quotation marks omitted). "Under the nexus test, 'the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself.'" *Id.* at 830 (quoting *Wolotsky*, 960 F.2d at 1335). "Application of these tests to the conduct of a private entity, however, is relevant only in cases in which there are no allegations of cooperation or concerted action between state and private actors." *Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004) (citations omitted); *see also Cooper*, 203 F.3d at 952 n.2; *Moore v. City of Paducah*, 890 F.2d 831, 834 (6th Cir. 1989) (holding that persons who conspire with state actors to deprive individuals of federally-protected rights may be found to have acted under color of state law for § 1983 liability purposes).

11

*Hooks v. Hooks*, 771 F.2d 935, 943 (6th Cir. 1985).  The standard for a civil conspiracy is set forth in *Hooks*:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action.  Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy.  Each conspirator need not have known all of the details of the illegal plan or all of the participants involved.  All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Id.* at 943–44.  In *Moore v. City of Paducah*, this court applied the civil conspiracy test in determining whether an individual had acted jointly with a state agent and was thus a state actor for purposes of § 1983 liability.  890 F.2d 831, 834–35 (6th Cir. 1989).  In holding that the evidence could not reasonably support a finding that an agreement existed, and affirming the district court's grant of a directed verdict, the *Moore* panel noted that there were various alternative grounds for and motivations behind the alleged unconstitutional action taken by the private individual.  *Id.* at 835.

As the district court noted and Lloyd points out, there is scant evidence in the record to support a finding that any agreement existed between Lloyd and Officer Warner to remove Wilkerson from the hallway as a response to her engagement in the alleged protected conduct.  In fact, as in *Moore*, the evidence points to alternative grounds for the actions of both Lloyd and Officer Warner.  The evidence supports a finding that—rather than in an effort to stifle Wilkerson's purported protected speech—Lloyd requested that someone "get [Wilkerson] out of [the area]," so that he could continue administering medical treatment to Coleman without the distraction of Wilkerson's interruptions.  At his deposition, Lloyd testified that he feared for his own safety

12

because of Wilkerson's aggressive nature and that her unprofessional and loud behavior was interfering with his and other HVA personnel's ability to treat Coleman.

Even viewing the evidence in the light most favorable to Wilkerson and drawing reasonable inferences therefrom in her favor, Wilkerson's position that the close temporal proximity of Lloyd's directive to remove Wilkerson from the hallway and Officer Warner's action in removing her is not sufficient to support a reasonable inference that there was a willful joint action to prevent her from exercising her right to criticize Lloyd's care. Moreover, there is no genuine issue of fact as to whether the directive by Lloyd and action by Officer Warner occurred close in time, as the amount of time elapsed between the request and the removal does not affect the outcome of the state actor determination. In fact, if the two were close in time, that temporal proximity would support Lloyd's position that he was working in a stressful environment to treat Coleman and needed Wilkerson removed from the area quickly, so that he and the other HVA personnel could continue rendering care.

Because there is no evidence in the record of an agreement and concerted action taken by Lloyd and Officer Warner and also no evidence that HVA and the police departments at issue had any arrangement, the district court was correct in finding Wilkerson's allegations conclusory. Viewing Wilkerson's deposition testimony and the other evidence in the light most favorable to Wilkerson, there is not sufficient evidence of a joint action of the type Wilkerson alleges. Accordingly, we affirm the district court's finding that insufficient evidence exists to support a finding that Lloyd was a state actor for purposes of § 1983 liability.

*2. Statute Clothing in State Authority*

Wilkerson additionally claims that the statutory definition of "obstruct" in the context of M.C.L. § 750.81d, which includes "a knowing failure to comply with a lawful command," supports her position that Lloyd was a state actor by clothing him with the authority of state law. She asserts that the statute at issue distinguishes paramedics from other civilians, who cannot give orders. She argues that Lloyd was transformed into a state actor when he exercised his statutory authority to give commands.

Lloyd responds that M.C.L. § 750.81d(1) does not authorize emergency services personnel to order any other official to act but instead penalizes persons who resist or interfere with people providing emergency assistance. Officer Warner claims that M.C.L. § 750.81d(1) is an ordinary state criminal statute that gives no power of enforcement, leaving it to be properly enforced by the police. Accordingly, Officer Warner argues that Lloyd had no power to order the detention of Wilkerson and that her detention was at Officer Warner's discretion based upon probable cause to believe she violated M.C.L. § 750.81d(1).

After reviewing the evidence in the record and the language of the Michigan statute at issue, M.C.L. § 750.81d(1), we do not find that the statute clothed Lloyd with state authority, such that he was exercising that authority in "commanding" Officer Warner to remove Wilkerson from the area, and in doing so, became a state actor. That M.C.L. § 750.81d(1) penalizes the obstruction of EMS personnel performing their duties does not convert such personnel into state actors where they otherwise would not be. Wilkerson cites no authority, from this circuit or any other, to support her position. The only cases cited by Wilkerson, which she claims "acknowledge that emergency

14

medical personnel are state actors," *Carver v. Cincinnati*, 474 F.3d 283 (6th Cir. 2007); *Jackson v. Schultz*, 429 F.3d 586 (6th Cir. 2005), both involved public emergency services companies, inapposite to HVA, the private corporation that employed Lloyd.  Accordingly, we reject Wilkerson's argument and affirm the district court's finding that Lloyd was not a state actor for § 1983 purposes.

**B.      Whether the District Court Erred in Finding that Wilkerson's Criticism of Lloyd's Conduct Was Not Protected by the First Amendment**

The district court found that Wilkerson "was not engaged in constitutionally protected activity when she protested the medical measures and techniques being utilized by HVA personnel on Coleman." *Wilkerson*, 2012 WL 1068107, at *7.  In making this finding, the district court determined that Wilkerson's comments, when viewed in the light most favorable to her, "consisted of criticism for the manner in which such officers and emergency medical personnel provided medical attention to the injured person (Coleman)–as the officers and emergency medical personnel were treating him." *Id.* at *8.  The court noted that, as it had already found that Lloyd and the other HVA personnel were not state actors, Wilkerson's criticism of their actions was not protected. *Id.* The district court further discussed that, unlike a public event where anyone has the right to assemble and speak, "the active treatment of Coleman was not a public activity upon which contemporaneous criticism served any purpose other than to interfere with the medical treatment of Coleman by trained medical personnel, as evidenced by the enactment of  M.C.L. § 750.81d." *Id.* Accordingly, the district court found, as a matter of law, that to the extent Wilkerson's retaliatory

prosecution claim was based on the comments she made contemporaneously with the rendering of

medical treatment, Wilkerson failed to state a claim upon which relief could be granted. *Id.*

> The elements of a First Amendment retaliation claim are as follows:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two-that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc) (opinion of Moore, J.) (citations

omitted). "[T]he First Amendment prohibits government officials from subjecting an individual to

retaliatory actions, including criminal prosecutions, for speaking out[.]" *Hartman v. Moore*, 547

U.S. 250, 256 (2006) (citations omitted). The first element of a First Amendment retaliation claim

is that the individual was engaged in protected conduct. *See Ctr. for Bio-Ethical Reform, Inc. v. City

of Springboro*, 477 F.3d 807, 821 (6th Cir. 2007). "It is well-settled that the freedom to criticize

public officials and expose their wrongdoing is a fundamental First Amendment value, indeed,

'[c]riticism of the government is at the very center of the constitutionally protected area of free

discussion.'" *Arnett v. Myers*, 281 F.3d 552, 560 (6th Cir. 2002) (quoting *Rosenblatt v. Baer*, 383

U.S. 75, 85 (1966)).

On appeal, Wilkerson claims that her contemporaneous criticism of Lloyd's actions was

protected speech under the First Amendment and that there is thus a genuine issue of material fact

as to whether Lloyd and Officer Warner retaliated against her for exercising her First Amendment

right to make those protected comments. Wilkerson's claim in this regard is dependent on the Court

first finding that Lloyd was a state actor, rendering her criticisms of his actions constitutionally protected.

We affirm the district court's dismissal of Wilkerson's First Amendment retaliation claims against Lloyd and Officer Warner. Because Lloyd was a private actor, he cannot be held liable for any alleged infringement of Wilkerson's First Amendment rights.[3] Further, even assuming that Wilkerson's loud criticism of Lloyd (in very close proximity to a chaotic scene of protesters as well as to Lloyd who was assessing Coleman's medical needs) was protected conduct, Officer Warner is entitled to qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Wilkerson argues that her constitutional right at stake is the right of private citizens to criticize public officials. But Lloyd is not a public official. Wilkerson cites no authority that clearly establishes she engaged in protected conduct in the specific context of this case. *See Hearring v. Sliwowski*, 712 F.3d 275, 279 (6th Cir. 2013) ("A government official will be liable for the violation of a constitutional right only if the right was clearly established . . . in light of the specific context of the case." (citations omitted) (internal quotation marks omitted).

## C.   Whether the District Court Erred in Granting Summary Judgment as to Other Defendants on the First Amendment Retaliation Claims

Although Wilkerson's arguments as to the other defendants are somewhat unclear, her arguments are based again, at least in part, on seeking reversal of the district court's finding that her

---

[3]We note that the First Amendment's protections are not limited to speech critical of public officials. *See*, *e.g.*, *Sandul v. Larion*, 119 F.3d 1250, 1255 (6th Cir. 1997) (holding that the plaintiff's shouting of curse word at abortion protestors was constitutionally protected speech). Further, we do not find persuasive the district court's reasoning implying that the enactment of a criminal statute removes speech from the ambit of the First Amendment.

17

criticisms of Lloyd's medical treatment of Coleman were not protected speech because Lloyd was not a state actor. In delineating and discussing which instances of critical speech by Wilkerson were and were not protected for purposes of Wilkerson's First Amendment retaliation claim, the district court found that a reasonable factfinder could determine that the public comments Wilkerson made criticizing law enforcement personnel at the scene, as well as law enforcement's treatment of protestors at the Tanter Speech, "on the evening of November 30, 2006, during December 2006 and in January 2007," were protected activity. *Wilkerson*, 2012 WL 1068107, at *8. Wilkerson appears to argue that because no evidence exists that she made public criticisms after she was released from custody on the evening of November 30, 2006, the district court's finding that Officers West and Conners could not have known about any of Wilkerson's protected speech activity prior to authoring their reports is plainly erroneous. Wilkerson maintains that all criticisms she voiced during Coleman's treatment were protected and were heard contemporaneously by Lloyd, as well as by Officers West, Conners, Warner, prior to the point when they wrote their police reports. Wilkerson thus implies that the officers falsified their reports after hearing the alleged protected criticisms.

Wilkerson's argument appears to be the mirror of her argument in Section B, *supra*, except with regard to other defendants. By arguing that the district court erred in finding that only her "post-incident" criticisms were protected, Wilkerson is arguing that her contemporaneous criticisms were protected and that law enforcement personnel who heard the criticisms could have considered them and altered their reports, which were drafted later that night.

Wilkerson's First Amendment retaliation claims predicated on her removal from the scene and detention fail because, as discussed *supra* in Section B, it was not clearly established that she

engaged in protected conduct. Moreover, her claims related to her subsequent prosecution under

M.C.L. § 750.81d(1) fail because, as discussed *infra* in Section D, she has not established the

absence of probable cause. *See Hartman v. Moore*, 547 U.S. 250, 252 (2006) (holding that, to

establish a First Amendment retaliatory prosecution claim, a plaintiff must prove "want of probable

cause").

**D.      Whether the District Court Erred in Dismissing Wilkerson's Fourth Amendment Claims Against Officers Warner, West, and Conners, Detective Mathews, and Dr. Domeier**

Wilkerson claims that the district court erred in finding that Officer Warner had probable

cause to seize and detain her, that Officer Warner did not use excessive force when he detained her,

and that probable cause existed to prosecute her.

*1.      Seizure and Detention*

Wilkerson claims that because she was engaging in protected speech when she was seized

by Officer Warner on November 30, 2006, Officer Warner did not have probable cause to seize her.

Wilkerson argues that, as Lloyd admitted Wilkerson did not physically interfere with his treatment

of Coleman, Officer Warner did not have probable cause to believe that she had attempted to resist

or obstruct the paramedics or that she had failed to comply with a lawful order of a police officer.

As to the latter, Wilkerson argues that Officer Warner's orders to step back were not lawful because

she was engaging in constitutionally protected speech at the time.

Wilkerson additionally discusses her forcible removal and detention in the stairwell for

approximately thirty minutes and argues that, because there was no reasonable basis for the original

intrusion, there could be no reasonable basis for the continued detention in the stairwell. She asserts

19

that a reasonable trier of fact could conclude that an unreasonable seizure occurred when her detention became an arrest through her forcible removal from the scene following her protected speech, together with the length of her detention.

At Lloyd's deposition, he testified that Wilkerson's yelling made him "uncomfortable" and "scared for [his] safety," and stated that it was distracting him from focusing on his patient. (R. 44-5). Officer Warner testified that it appeared to him that Wilkerson's behavior distracted the HVA personnel tending to Coleman. Officer Warner points out that Wilkerson admitted at her deposition to having heard his commands to step back from the police line. She then stated that she did not think that the commands applied to her as a medical professional giving aid on the scene. Officer Warner, however, contends that Wilkerson was not giving aid to Coleman at the time, that Wilkerson's misunderstanding of the applicability of the commands to her does not make the commands less lawful, and that Wilkerson never produced any credentials or gave her name to prove that she was a medical professional.

The district court found that the detention was "'reasonably related in scope to the circumstances which justified the interference in the first place.'" *Wilkerson*, 2012 WL 1068107, at *16 (quoting *United States v. Perez*, 440 F.3d 363, 372 (6th Cir. 2006)). The district court held that Officer Warner had both reasonable suspicion that criminal activity was afoot and probable cause to believe that Wilkerson was engaged in criminal activity, namely that she was interfering with the HVA personnel's care of Coleman. *Id.* The district court lists the testimony of several officers and the HVA personnel detailing that Wilkerson was repeatedly directed to move back but that she yelled and ignored the commands or only moved back briefly before coming forward again.

20

*See id.* In finding both reasonable suspicion and probable cause that Wilkerson had violated M.C.L. § 750.81d(1), the district court rejected Wilkerson's argument that the statute requires physical interference with the performance of duties, rather than a "'knowing failure to comply with a lawful command.'" *Id.* at *17. The district court further found that, because Wilkerson was not engaged in protected activity when she was interfering with the treatment of Coleman, any command by Officer Warner to move away was a lawful command, and given her failure to comply with the verbal commands of Officer Warner and Lloyd, it was not unreasonable for Officer Warner to physically escort Wilkerson from the scene. *Id.*

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Not every contact between a police officer and a member of the public is a seizure. *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990). The test for determining if an individual has been seized is whether a reasonable person in those circumstances would have felt she was not free to leave. *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988); *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010); *United States v. Cooke*, 915 F.2d 250, 252 (6th Cir. 1990). In this case, no one contests that Wilkerson was seized when Officer Warner put her hands behind her back and took her out of the hallway and into the stairwell.

Officer Warner contends that, at the time he seized Wilkerson, he had both reasonable suspicion to conduct an investigatory stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), and probable cause to arrest her. Assessing whether an investigatory stop comported with the Fourth Amendment is a two-step process: First, the court must determine whether the officer had a reasonable basis for the stop by examining whether the officer had reasonable suspicion supported

by specific and articulable facts. *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006). Second, if the stop was proper at its inception, the court must examine whether the intrusiveness of the stop was reasonably related to the situation by reviewing the reasonableness of the officer's actions in the context of the presenting circumstances. *Id.*

A police officer may briefly detain an individual on less than probable cause: "[A] brief investigative stop, or *Terry* stop, by an officer who is able to point to 'specific and articulable facts' justifying his or her reasonable suspicion that the suspect has been or is about to be involved in criminal activity is not an unreasonable seizure." *United States v. Martin*, 289 F.3d 392, 396 (6th Cir. 2002) (quoting *United States v. Sokolow*, 490 U.S. 1, 12 (1989)) (additional citation omitted). Depending upon the circumstances giving rise to the investigative stop, the officer's reasonable suspicion permits the officer to detain the suspect while asking an appropriate number of questions to identify the suspect and either confirm or dispel the officer's suspicions. *Id.* at 396. If the suspect's answers fail to supply the officer with probable cause to arrest the suspect, then the officer must release the suspect. *Id.* at 396–97. The court assesses the reasonableness of the officer's suspicion in light of the totality of the circumstances surrounding the stop. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005) (quoting *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (en banc)).

The statute at issue here, M.C.L. § 750.81d(1), provides:

> Except as provided in subsections (2), (3), and (4), an individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers a person who the individual knows or has reason to know is performing his or her duties is guilty of a felony punishable by imprisonment for not more than 2 years or a fine of not more than $2,000.000, or both.

For purposes of this statute, a "person" includes "[a] police officer of this state or a political subdivision of this state . . . ," "[a] police officer of a junior college, college, or university . . . ," and "[a]ny emergency medical service personnel described in 20950 of the public health code, 1978 PA 368, MCL § 333.20950." M.C.L. §§ 750.81d(7)(b)(i), (ii), (ix). M.C.L. § 750.81d(7)(a) provides that "[o]bstruct includes the use or threatened use of physical interference or force or a knowing failure to comply with a lawful command." *Id.* (internal quotation marks omitted).

Upon review of the facts, when viewing them in the light most favorable to Wilkerson, Officer Warner had both reasonable suspicion that criminal activity was afoot, namely a violation of M.C.L. § 750.81d(1), sufficient to briefly detain Wilkerson under *Terry*, and probable cause to arrest Wilkerson for a violation of the same statute. Both Lloyd and Officer Warner are "person(s)" under the statute, and both were in the course of performing their duties when Wilkerson yelled at Lloyd while he was treating Coleman. *See* M.C.L. §§ 750.81d(7)(b)(i), (ix). As obstruction under the statute includes both "the use or threatened use of physical interference or force [and] a knowing failure to comply with a lawful command," Wilkerson was obstructing Lloyd and Officer Warner under the statute by refusing to step out of close proximity to the treatment of Coleman. *See* M.C.L. § 750.81d(7)(a). As Officer Warner argues, the fact that Wilkerson did not believe Officer Warner's repeated commands applied to her as a doctor on the scene does not change the fact that she heard the commands and failed to adhere to them. *Cf. People v. Perry*, No. 298241, 2011 WL 3629231,

at *1 (Mich. Ct. App. Aug. 18, 2011) (explaining that "actual knowledge" is not required to establish

a knowing failure to comply with a lawful command (citing *People v. Nichols*, 686 N.W.2d 502, 505

(Mich. 2004)).

As stated above, the second part of a reasonable suspicion analysis is "'whether the degree

of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by

examining the reasonableness of the officials' conduct given their suspicions and the surrounding

circumstances.'" *Caruthers*, 458 F.3d at 464 (ellipses in original) (quoting *United States v. Davis*,

430 F.3d 345, 354 (6th Cir. 2005)). In determining whether an investigative stop is reasonably

related to the basis for the original intrusion, the court considers the following factors: the length of

the detention, the manner in which the detention was conducted, and the degree of force used.

*Dorsey v. Barber*, 517 F.3d 389, 399 (6th Cir. 2008); *see Houston v. Clark Cnty. Sheriff Deputy

John Does 1-5*, 174 F.3d 809, 814 (6th Cir. 1999). Given that, as discussed below, questions of

material fact exist as to whether Officer Warner used excessive force during the stop and detention

of Wilkerson, we are unable to conclude as a matter of law that his confrontation with Wilkerson

was a mere investigative stop rather than an arrest. *See Feathers v. Aey*, 319 F.3d 843, 851 (6th Cir.

2003) ("[I]f the force went beyond that necessary for the *Terry* stop, we interpret it as a signal that

the confrontation had escalated into an arrest.").

Nevertheless, even assuming that an arrest occurred, Officer Warner had probable cause to

arrest Wilkerson based on a reasonable belief that she acted in violation of M.C.L. § 750.81d(1) due

to her failure to heed his commands intended to secure the scene for the EMS personnel. *See

Stricker v. Twp. of Cambridge*, 710 F.3d 350, 363 (6th Cir. 2013) (finding probable cause for

plaintiffs' arrest under § 750.81d based on their failure to heed to officers' directives to permit entry into their home so they could secure the scene for EMS personnel or to have the ill individual leave the home).

2.      *Excessive Force*

The district court found summary judgment appropriate on Wilkerson's § 1983 excessive force claim, because it found "the degree of force used by Warner was 'reasonably related to the basis for the initial intrusion.'" *Wilkerson*, 2012 WL 1068107, at *17. The district court determined that the undisputed evidence showed Officer Warner grabbed Wilkerson, put Wilkerson's hands behind her back, and "marched her out of the area . . . and into the stairwell." *Id.* at *18. "The evidence is also undisputed that once Warner got Plaintiff into the stairwell, he released her wrists, he did not handcuff Plaintiff, and he did not use any physical force against Plaintiff thereafter." *Id.* The district court further noted that there is no evidence that Wilkerson was injured. *Id.* She did not visit a doctor, instead prescribing herself the same physical therapy she received prior to the incident. *Id.* The district court found "that the degree of force used by Warner against Plaintiff under the circumstances 'was objectively reasonable in light of the clearly established constitutional rights' of Plaintiff." *Id.* (internal alterations omitted). Accordingly, because the district court found that Officer Warner's seizure and detention of Wilkerson did not violate her Fourth Amendment rights, the court found that Officer Warner was entitled to qualified immunity on the related claims. *Wilkerson*, 2012 WL 1068107, at *18.

Review of a question of qualified immunity under § 1983 is a two-prong process. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The first prong is determining whether when

"[t]aken in the light most favorable to the party asserting the injury . . . . the facts alleged show the officer's conduct violated a constitutional right[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[4] The second prong is to determine whether the right was clearly established. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202 (citing *Wilson v. Lane*, 526 U.S. 603, 615 (1999)). Qualified immunity does not apply to shield the officer if a claim meets both prongs.

Wilkerson claims that Officer Warner deprived her of her Fourth Amendment right to be free from the excessive use of force during her arrest. Wilkerson objects to the district court's characterization that Officer Warner used limited means. She testified that Officer Warner grabbed her roughly, pushed her up against a wall, and twisted her arm forcefully behind her back, causing her extreme pain. Wilkerson further asserts that Officer Warner continued to twist her arm behind her back even after she pleaded with him to stop, because she had a bad shoulder and was experiencing extreme pain. Wilkerson also alleges that she required treatment, in the form of physical therapy, for her shoulder. She contends that Officer Warner's actions were unreasonable and excessive based on the totality of the circumstance.

The Supreme Court has established that the right to be free from excessive force during an arrest or investigatory stop exists as part of the Fourth Amendment's protection against unreasonable

---

[4]Although *Saucier* mandated that the questions be addressed in order, that requirement has been relaxed. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.").

26

seizures. *Graham v. Connor*, 490 U.S. 386, 394 (1989). Accordingly, we find, taking her allegations as true, that Wilkerson has properly alleged a Fourth Amendment deprivation.

Turning to whether any officer would have found Officer Warner's actions to be reasonable, the Fourth Amendment standard for reasonableness of an officer's use of force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). However, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* Officer Warner responds that when giving deference to his on-the-spot judgment, he did not use excessive force in detaining Wilkerson.

Reviewing the totality of the circumstances, there is no indication that Wilkerson posed an immediate threat to the safety of any officer or others on the scene, and there is some factual dispute as to whether Wilkerson ever attempted to cross the police line between the public and the treatment that was occurring. There is also a lack of evidence that Wilkerson was resisting arrest; in fact, Wilkerson alleges that she was attempting to leave the scene at the point at which Officer Warner detained her. We weigh the reasonableness of Officer Warner's actions under the lens of all of these factors.

When viewing the evidence in the light most favorable to Wilkerson, we find that a genuine issue of material fact exists as to whether Officer Warner's actions were excessive. Plaintiffs may "allege use of excessive force even where the physical contact between the parties did not leave

27

excessive marks or cause extensive physical damage." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 252 (6th Cir. 2010) (citations omitted) (internal quotation marks omitted). In *Miller*, this court found the existence of an issue of fact preventing qualified immunity by finding "that a jury could reasonably find that slamming an arrestee into a vehicle constitutes excessive force when the offense is non-violent, the arrestee posed no immediate safety threat, and the arrestee had not attempted to escape and was not actively resisting." *Id.* at 253–54 (citing *Graham*, 490 U.S. at 396). The *Miller* court reviewed several cases wherein this court has found genuine issues of material fact in cases alleging excessive force during arrest. *Id.* at 253; *see Carpenter v. Bowling*, 276 F. App'x 423, 426–28 (6th Cir. 2008) (plaintiff thrown against van was not resisting arrest and sought medical treatment resulting in physical therapy for injuries); *Zantello v. Shelby Twp.*, 277 F. App'x 570, 574 (6th Cir. 2008) (plaintiff engaged in violent crime but did not resist or attempt to evade arrest, officers twisted his arms, and plaintiff suffered torn rotator cuff); *Lustig v. Mondeau*, 211 F. App'x 364, 369–71 (6th Cir. 2006) (plaintiff accused of driving watercraft while intoxicated and officer twisted arm although not resisting); *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 174 (6th Cir. 2004) (plaintiff arrested for trespass in movie theater kicked and thrown against display despite minor nature of offense, posing no immediate threat, and not attempting to flee scene); *Burden v. Carroll*, 108 F. App'x 291, 293–94 (6th Cir. 2004) (plaintiff reportedly threatened someone and was belligerent and officer pushed against brick wall); *Minchella v. Bauman*, 72 F. App'x 405, 409–10 (6th Cir. 2003) (plaintiff's crime was not severe, plaintiff posed no threat to officers or community, and evidence was inconclusive as to whether plaintiff slammed into car and whether resisted arrest).

In accordance with our precedents, we find that, when viewing the facts in the light most favorable to Wilkerson, a reasonable jury could believe that Officer Warner's alleged actions in aggressively pulling plaintiffs' arms backward, marching her out of the hallway, and pushing her into the wall, all resulting in a re-aggravated shoulder injury requiring physical therapy, were excessive when her offense was non-violent, she posed no immediate threat of safety to Officer Warner or the public, and she did not attempt to escape and did not actively resist arrest.

*3.      Malicious Prosecution*

To succeed on a Fourth Amendment claim for malicious prosecution, a plaintiff must prove (1) that a criminal prosecution was initiated against the plaintiff and the defendant made, influenced, or participated in the decision to prosecute; (2) a lack of probable cause for the criminal prosecution; (3) that, as a legal consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) that the criminal proceeding was resolved in the plaintiff's favor. *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010).

*a.      Officer Warner*

Wilkerson alleges that Officer Warner's report contains false statements and material omissions that provided the basis for her prosecution, specifically that he did not include the fact that Wilkerson was rendering medical care to Coleman prior to HVA's arrival. She further claims that Officer Warner's description that she was verbally abusive and combative toward officers, as well as his account that he directed her to step back and "stop attempting to push past officers," and that "the HVA supervisor specifically advised [Wilkerson] that she was hindering HVA personnel in their ability to medically assess the patient," are false statements. Because Wilkerson contends that

his was the only report to "expressly allege" that she physically interfered with HVA personnel and that she failed to comply with an officer's order, Wilkerson claims that Officer Warner's report "was the only clear basis upon which Wilkerson could be charged with violating" M.C.L. § 750.81d(1). As Wilkerson alleges that Officer Warner's report included knowing false statements provided to the prosecutor's office, she claims that Officer Warner violated her Fourth Amendment right to be free from prosecution without probable cause.

Officer Warner claims that he had no part whatsoever in the decision to charge Wilkerson with a crime. He asserts that he filed his report on the night of the incident, as was his duty as an AAPD officer, but that there is no evidence that he had any contact with the prosecutor's office leading up to its decision to charge Wilkerson. Officer Warner additionally contends that Wilkerson has not alleged facts to show an absence of probable cause in the prosecution.

As described above, Officer Warner had probable cause to arrest Wilkerson for violation of M.C.L. § 750.81d(1) when he detained her at the Michigan League. Officer Warner dictated his report on the evening of November 30, 2006, based upon his observations during the incident surrounding the Tanter Speech. As to Wilkerson's claim that Officer Warner's report included a material omission because he did not write that Wilkerson was rendering medical care to Coleman prior to HVA's arrival, the district court found:

> The absence of this "fact," even if it constituted an accurate depiction of an event that occurred, does not constitute evidence that Warner's report was false. An officer need not include every statement or action that occurred during an incident, and the absence of a "fact" does not necessarily render the report false. Moreover, even if Plaintiff was rendering medical care to Coleman pending the arrival of the HVA team, that "fact" does not show that Plaintiff was involved in—or had a right to be involved in—providing such care once the HVA team arrived. This is significant

because the uncontroverted evidence—whether it was from the statements of numerous persons at the scene of the Coleman Incident or Plaintiff's own deposition testimony—reflects that, except when West and Conners allowed Plaintiff to check Coleman's vital signs, Plaintiff was not rendering medical care to Coleman at any time.

*Wilkerson*, 2012 WL 1068107, at \*11.

"An investigator may be held liable under § 1983 for making material false statements either knowingly or in reckless disregard for the truth to establish probable cause for an arrest." *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003) (citing *Ahlers v. Schebil*, 188 F.3d 365, 373 (6th Cir. 1999)). "To overcome an officer's entitlement to qualified immunity, however, a plaintiff must establish: (1) a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the finding of probable cause." *Id.* (citations omitted).

As the district court found, Wilkerson has not made a substantial showing that Officer Warner "stated a deliberate falsehood or showed reckless disregard for the truth[.]" *Id.*; *see also Wilkerson*, 2012 WL 1068107, at \*12–13. The evidence of record supports a finding that his report was consistent with the events of November 30, 2006. Additionally, as the district court noted, Wilkerson has not provided any evidence to support a finding that the Washtenaw County prosecutor would not have sought charges against Wilkerson without the alleged false statements. *See id.* at \*13.

Because both Officer Warner's report and the police reports prepared by Officers West and Conners provide a basis for a finding of probable cause, we affirm the district court's finding that

31

Wilkerson has not overcome Officer Warner's entitlement to qualified immunity as to Wilkerson's claim of malicious prosecution.

b.       *Officer West, Officer Conners, Detective Mathews, and Dr. Domeier*

Wilkerson next contends that "[w]hile the probable cause determination to initiate the prosecution against Wilkerson was based upon the false statements contained in Defendant Warner's incident report, it was the false statements, acquiescence in those false statements, and/or withholding of exculpatory evidence by Defendants West, Conners, Matthews (sic), and Domeier that maintained Wilkerson's prosecution without probable cause."

Despite rejection of the new charges by the trial court, Wilkerson points to Detective Mathews's attempt to add charges for attempted resisting and obstructing of Officers West and Conners as evidence of Officers West's and Conners's intent, because they "acquiesced in the request for these charges, allowing themselves to be added as complainants even though they had firsthand knowledge" that the evidence did not support those charges. Wilkerson argues that because this "acquiescence" was improper, it "gives rise to a reasonable inference that Defendants Matthews' (sic) and Domeier's motives as to the charge involving HVA personnel were also improper." Wilkerson further asserts that by claiming that the use of ammonia to awake an unconscious person was not medically contraindicated, Detective Mathews and Dr. Domeier acted in concert to conceal the fact that Wilkerson was right in her criticism of Lloyd that his use of ammonia inhalants was inefficacious and punitive. Wilkerson claims that this accusation is related to her claim for prosecution without probable cause because defendants were making these false

32

claims with the purpose of showing that Wilkerson did not have a legitimate medical concern for Coleman.

Because Wilkerson did not brief the issue, Dr. Domeier argues that she waived her right to appeal the district court's dismissal of the claims against him based upon qualified immunity. Dr. Domeier also asserts that there is no evidence that he violated Wilkerson's Fourth Amendment rights, as he was first contacted by Detective Mathews to discuss the use of ammonia inhalants in May 2007, several months after charges were initiated against Wilkerson on January 23, 2007. Accordingly, Dr. Domeier was not involved in the decision to charge Wilkerson, and Wilkerson would have been prosecuted regardless of his involvement. Detective Mathews claims that Wilkerson has put forth no evidence to show that Detective Mathews knew or should have known that the report contained false statements. Moreover, because there was no evidence that he improperly involved himself in the decisions of the prosecutor, Detective Mathews argues that the decision of the prosecutor is entitled to a presumption of regularity, citing *United States v. Armstrong*, 517 U.S. 456, 464–66 (1996).

Because there is no evidence that Officer Warner's report contained false statements, Wilkerson's argument against Officers West and Conners and Detective Mathews, based upon the acquiescence in the alleged false statements in Officer Warner's report, fails. Moreover, because we find that probable cause existed to initiate criminal charges against Wilkerson, we find that she has not established the elements of her malicious prosecution claims against Officers West and Conners, Detective Mathews, and Dr. Domeier.

**E.      Whether the District Court Erred in Dismissing Wilkerson's State-Law Claims**

*1.      Assault and Battery*

Because the district court found that Officer Warner had both reasonable suspicion and probable cause to detain Wilkerson, and also found that he used reasonable force in doing so, the district court found that Wilkerson's state-law assault and battery claims failed as a matter of law. *Wilkerson*, 2012 WL 1068107, at \*20.  In Michigan, to recover under an assault theory, a plaintiff must show: (1) an intentional unlawful offer of corporal injury to another by force, or force unlawfully directed toward the person of another; (2) under circumstances which creates a well-founded apprehension of imminent contact; (3) coupled with the apparent present ability to accomplish the contact.  *VanVorous v. Burmeister*, 687 N.W.2d 132, 142 (Mich. Ct. App. 2004). Battery is a "wilful and harmful or offensive touching of another person, which results from an act, intended to cause such a contact."  *Id.* (internal quotation marks omitted).

Because, when viewing the facts in the light most favorable to Wilkerson we find that Officer Warner's use of force in detaining Wilkerson was not reasonable as a matter of law, we find that a question of fact exists as to Wilkerson's assault and battery claims.  *See Grawey v. Drury*, 567 F.3d 302, 315–16 (6th Cir. 2009) (affirming denial of summary judgment as to Michigan state-law assault and battery claims because court found that officer's use of force was not reasonable as a matter of law for qualified immunity purposes); *Oliver v. Smith*, 810 N.W.2d 57, 64 (Mich. Ct. App. 2010) (explaining that "a police officer's use of excessive force in effectuating an arrest is a ministerial act and not entitled to the cloak of immunity").

2.      *False Imprisonment*

The district court found that Officer Warner had the right to detain Wilkerson, as he was on active duty and serving in his capacity as an AAPD officer at the time when he detained her, and because he had both reasonable suspicion and probable cause. *Wilkerson*, 2012 WL 1068107, at *21. Prevailing on a false imprisonment claim under Michigan law requires a showing that the defendants "'participated in an illegal and unjustified arrest, and that [the defendants] lacked probable cause to do so.'" *Bletz v. Gribble*, 641 F.3d 743, 758 (6th Cir. 2011) (alteration in original) (quoting *Walsh v. Taylor*, 689 N.W.2d 506, 513 (Mich. Ct. App. 2004)). "'The elements of false imprisonment are (1) an act committed with the intention of confining another, (2) the act directly or indirectly results in such confinement, and (3) the person confined is conscious of his confinement.'" *Id.* (quoting *Walsh*, 689 N.W.2d at 514).

Because we find that Officer Warner had reasonable suspicion and probable cause to detain Wilkerson when he did so, we affirm the district court's dismissal of plaintiff's false imprisonment claim.

3.      *Malicious Prosecution*

Under Michigan law, a plaintiff must prove the following to establish a claim for malicious prosecution: (1) defendant initiated criminal prosecution against plaintiff; (2) the criminal proceedings terminated in plaintiff's favor; (3) the person who instituted, continued, or maintained the prosecution lacked probable cause for his actions; and (4) the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice. *Matthews v. Blue Cross & Blue Shield of Mich.*, 572 N.W.2d 603, 609–610 (Mich. 1998). In cases against

35

police officers, "the only situation in which an action for malicious prosecution would properly lie is where a police officer knowingly swears to false facts in a complaint, without which there is no probable cause." *Payton v. City of Detroit*, 536 N.W.2d 233, 242 (Mich. Ct. App. 1995) (quoting *King v. Arbic*, 406 N.W.2d 852, 858 (Mich. Ct. App. 1987) (internal quotation marks omitted). "Failure to include all exculpatory facts is not adequate to sustain a suit for malicious prosecution." *Id.*

Wilkerson asserts that the district court should have accepted her version of the facts as true, meaning that it should have analyzed the malicious prosecution claim under the assumption that the statements in Officer Warner's report were false. Wilkerson claims that the passages, falsely alleging that she physically interfered by trying to "push past" officers and that she failed to comply with Officer Warner's lawful order to "step back," provide the basis for a finding of probable cause to charge her. Wilkerson additionally mentions Officer West as having provided the only potentially corroborating statement in his report, which she also claims was false, that the officers "escorted the lady that had identified herself as a doctor out of the area because she would not stay back and let paramedics do their job." (R. 50-2).

Officer Warner asserts that the district court was correct in granting summary judgment in his favor on this claim because he did not initiate criminal proceedings against Wilkerson, because there is no evidence that he knowingly swore false facts in a complaint, and because Wilkerson cannot show a lack of probable cause to prosecute her. Officer West responds that his report was not knowingly false and that, even if it was false, it did not provide the sole basis for the prosecution of Wilkerson.

There is no evidence that Officer West falsified his report for it to corroborate Officer Warner's allegedly false report. Moreover, as discussed above, Wilkerson has presented no evidence to support a finding that Officer Warner's report included false statements.

Accordingly, because there is no evidence that either Officer Warner or Officer West knowingly included false statements in their reports and because there was probable cause to prosecute Wilkerson, we affirm the district court's dismissal of Wilkerson's state-law malicious prosecution claim.

## IV. CONCLUSION

For the reasons explained herein, we **REVERSE** the grant of summary judgment to Officer Kevin Warner on Wilkerson's Fourth Amendment excessive force claim and state-law assault and battery claims, and remand this case for further proceedings with respect to those claims. We **AFFIRM** the grant of summary judgment to defendants on all other claims.